Please rise. Illinois County Court, Second Division, is now in session. Honorable Judge John B. Simons presents. Marty, please be seated. Welcome.  And could I have the names for the presenter for the appellant? My name is Emily Philppe, and I represent Carrie Williams. And for the appellee? Good morning, Your Honors. Carol Gaines on behalf of the people. Very well, thanks. We're going to give you each 20 minutes, and then you'll have a chance for rebuttal, a 10-minute rebuttal. And if we need some more time, we'll stretch it some. So with that, Ms. Williams, would you like to start? I'm sorry, Ms. Philppe. Carrie Williams didn't get a fair trial. And he didn't get a fair trial because of the things that happened during opening and closing arguments. This morning, I'm going to focus on what happened at the end of the trial first in rebuttal. Can I take you back a little bit first? Sure. That is, the State said that it was going to introduce some evidence and then didn't at the commencement of the trial. Correct. And that blew out the motive evidence that could have been used on behalf of Mr. Williams. Is that correct? Correct. He had his friends, Duke had been shot. Correct. And Tommy Williams, no relative, had been shot to death. Exactly. And so the prosecutor told the jury that Williams was friends with Dukes and Tommy Williams, Black Key Stones, that had been shot. And according to the State, that was the, their death was the impetus for this revenge killing. So the prosecutor told them, told the jury seven times that Williams was friends with these two individuals, but they never presented any evidence of this friendship. In fact, they never presented any evidence that Williams even knew these two individuals. This evidence was, or this argument was so improper because they highlighted a personal connection between Williams and Dukes and Tommy Williams that they didn't present any evidence of. And this personal connection gives Williams a personal motive that wasn't present based on the evidence at trial. This relationship, this link again, was so important to the State though, because the only one in this trial that has a personal motive based on the evidence is straight, the State star witness. And so these unsupported comments by the prosecutor that Williams was friends with these two individuals is an attempt to give Williams a personal motive that's just unsupported by the evidence. And that's why it was so prejudicial in this case. Did Straight testify that he was friends with the two earlier victims? He did. And actually, Straight has a very strong personal motive. Of all three co-defendants, Straight's personal motive is the strongest. He was shot by gangster disciples two years before the incident shooting. Again, he said that he was friends with Dukes and Tommy Williams. And arguably, Straight could have prevented Dukes' death. On the night of Dukes' murder, Dukes and Minifield went to a basketball game. Minifield called Straight and asked him to bring a gun, saying that they were scared. Straight never brought a gun. And that was the night that Dukes ended up murdered by gangster disciples. Did Straight say that the defendant, Williams, was a friend of the two earlier victims? No. Straight never testified to that. And notably, the State never asked. The State never asked Straight. The State never asked Williams. It didn't say, Mr. Williams, are you friends with these two people? In fact, the State didn't even ask if he knew these two people. So what was the point, from your perspective? Of the comments and opening argument? To give Williams a personal motive. Because, as I said before – Well, I understand that. So what was the point of not – Of not asking? I don't know, Your Honor. I just know that they didn't even try to elicit this testimony, yet they made a significant commotion about it in opening argument, mentioning friendship seven times. That's a strong theme for the prosecutor, to mention friendship seven times. The first preserved error in the closing argument, in the rebuttal argument, is that the prosecutor vouched for the credibility of its star witness, Angelo Straight. Straight's credibility was critical for the State. The State needed the jury to believe Straight's version of the shooting over Williams' version of the shooting in order to obtain Williams' conviction. Even though there was gunshot residue on Straight's hands, it was his guns that were used in the shooting, he was a convicted felon, and, again, the one with the strongest personal motive to do this shooting, Straight was offered a sweetheart deal from the State. Fifteen years at 50% for conspiracy, which was an uncharged offense in this case. In fact, he gets out next year. When he was arrested, Straight gave multiple statements to the police, none of which became the basis for his trial testimony. After ten months in jail, Straight goes to the prosecutor and asks for a deal, asks to testify against Minifield and Straight with a whole different story, and that story that he brought to the prosecutor ten months later becomes the basis of his trial testimony. During rebuttal argument... Straight wasn't a marked man out of all this, though, was he? There was no evidence that he was a marked man. That was a theme that the prosecutor had in his rebuttal argument, but there was no evidence. Was that part of the State's desire to put credibility into Straight after he had flipped? That's my argument, Your Honor. In this case, the prosecutor went on for two pages saying that Straight was a marked man. Specifically, the prosecutor also said that Straight was going to prison as a snitch. Was there any evidence in the record whatsoever? I saw none that supported it. There was no evidence in the record that Williams or Minifield threatened Straight. There was no evidence that Straight had been threatened at any point, that he was afraid, that... There was just no evidence about that. The closest evidence, just to play devil's advocate here, the closest evidence that the State has for that is the gang specialist said that there tends to be a code of silence among gang members. Specifically, though, the gang specialist did not say that every time a gang member snitches or flips, that they become a marked man. No one testified that Straight was a marked man. That's very important here, though. And again, the State never asked. The State never even tried to elicit this testimony. The State never said, asked Straight, were you threatened? Are you afraid? Are you worried? The Straight went to the prosecutor and asked to testify against Minifield and asked to testify against Williams. There was just no evidence that he was actually marked or threatened. But was it a process of after destroying Straight in terms of what he was, a liar, and everybody agrees he was a liar, lied about his mother and the guns and other things as well, that then they rehabilitated him in order to make him more convenient and better witness a trial? I think that's what the prosecutor was trying to do. But the prosecutor, there's a proper way to do this and an improper way to do that. And here, the prosecutor did that by saying that he was a marked man despite the fact that there was no evidence of this. And saying that a witness has been threatened or suggesting to the jury that a witness has been threatened by a defendant is highly prejudicial because it suggests that the defendant has a consciousness of guilt. But the prosecutor also vouches for the credibility of Straight. Let's talk about the shooting itself. Williams was a shooter, correct? The shooting at the Gangster Disciples? The terminal event? Williams was there. Straight, Williams, and Minifield were all in the car. According to Williams' testimony, he was in the front passenger seat of the car. It was a party day. He was drinking all day. He said he was drunk. He was in the seat. The seat was reclined back. It was shown by the photos. He said his eyes were closed. He was asleep or resting. He had also taken marijuana? I'm not sure on that particular fact, Your Honor. I know that the State's witness, Cook Mims, said he was high and had been taking marijuana. But I don't remember about Williams. He being Mims? Yes, yes. Yeah, I don't know if he asked. But he said he woke up when Straight was leaning over him shooting. The State's case, on the other hand, rests on Straight and Theotis Cook Mims. And Straight testifies that he wasn't shooting. He was driving. And even though he had gunshot residue on his hands, that Williams, who was in the front passenger seat, and Minifield in the back seat, were shooting out the passenger side windows. Theotis Cook Mims, though, is the only non-codefendant eyewitness in this case. Cook Mims admits he was high during the shooting. He couldn't identify anybody after the shooting. He couldn't. He said, right, he didn't identify anyone at the shooting, even though he knew all the people in the car. Also, when he did speak to the police, the first statement he gave, the closest to the shooting, he says that he was looking at Minifield in the back seat because Minifield had a gun with a laser sight. He told the police right away that he couldn't tell if Williams had a gun or not. He couldn't tell. And this was the only non-codefendant eyewitness to this case. The evidence here was closely balanced. And that's why this pattern of prosecutorial misconduct, referring to Strait as a marked man and vouching for Strait's credibility was so prejudicial because it tipped the balance. It tipped the credibility away from Williams and towards Strait based on non-evidence and things that they didn't question the witnesses about and they didn't present. I think I may have distracted you with my questions, but you were going to talk about vouching. I was. During rebuttal, the prosecutor informed the jury that when Strait approached him in January of 2010, he didn't take everything Strait said for the truth right away. According to the prosecutor, we checked it out. The prosecutor told the jury we checked it out four separate times despite repeated defense objection. Even though he didn't say, I believe, the prosecutor's use of the term we hear is particularly problematic. It places the integrity of the state's attorney's office behind the credibility of the state's star witness. It tells the jury that we, the prosecutor, other prosecutors, the FBI, the state, have already assessed Strait's credibility before even putting him on the stand. Eventually, after overruling two of the defense objections, on the third objection, the trial court tells the prosecutor, sustained as to we, state the evidence corroborates itself. You don't corroborate. That's the error here. The court didn't realize it. The court said, state that the evidence corroborates. You don't corroborate. Didn't those admonitions assist the defense? Well, by pointing out that this was an error. But the court's remarks were directed to the prosecutor. The court didn't admonish the jury to disregard this testimony in any way. And also, after the court said this to the prosecutor, said, sustained as to we, state the evidence corroborates. You don't corroborate. The prosecutor said it one more time, said, we check it out. The prosecutor didn't stop. Counsel, isn't this, you relied on a people versus Schaefer out of the 5th District. Your proposition that it was prejudicial because the prosecutor is saying, we are vouching for the credibility because we checked it out. But doesn't Schaefer and some of the supporting cases in favor of the defense really go to the issue that it's the state or the prosecutor or the officer saying that it's based on that person's experience, not based on any evidence to corroborate the state's case, not based on any research or investigation that was performed. But it was based on, for instance, in Schaefer, it was based on the, I believe, the prosecutor's years of experience versus actual investigation and evidence. Correct. How is this different? Isn't this based on the FBI investigation? This is different. Admittedly, I was unable to find a case that was exactly on point where the prosecutor had said repeatedly, we checked it out. But in Schaefer, the prosecutor is saying that this individual is trustworthy because of his years of experience, that he understands this. And in a way that's similar. This case, the prosecutor is saying, we checked it out. Back in January 2010, when this individual came in, we checked it out. I just want to go back to Schaefer. There's some fine distinctions made by the 5th District in that case. The appellate court breaks down three statements. The first one is, I've been through this, and after five years, I can cut through the BS, first statement. Second one is, what he said at the police station was sustained by what we found that night when we searched his residence. The third one is, I don't think he's the most stellar person, but I think he told the truth. The court said the second and the third are arguably okay. And the second is the one that says what he said was sustained by what we found in his residence. So it correlates to corroborating evidence. Isn't that exactly the situation here? And technically, the 5th District said it arguably was okay. It only found the first statement to be an error. No, Your Honor. This is different because in that case, the second statement was based on the evidence that was presented at trial. And that's the big distinction here. Here the prosecutor is saying that back in January 2010, we checked it out. We don't know if the evidence or what the prosecutor did back in January 2010 was the evidence that was presented to the jury. Arguably it was, but we have no way of knowing. And more importantly, the jury has no way of knowing. I mean, the danger with these comments is that you can't tell the jury that you have some sort of test to determine whether you've put out an honest witness. It's up for the jury to determine the credibility of a witness based on what happens at trial. So there's nothing tying the FBI testimony to whether or not that actually occurred, and that's what the state was referring to. There's nothing explaining what we checked it out, like what evidence they looked at or how they checked it out. In this long section of argument from the prosecutor, the prosecutor does discuss the phone records and the FBI evidence that's presented at trial, but it doesn't make it clear that that's the same evidence that we checked it out. And that's the problem. Again, he's talking about checking it out back in January 2010, not what happened at trial. Had the prosecutor argued only about the evidence at trial, that's okay. That's proper. I mean, that's what happened in the state's opening closing argument. They argued that straight was credible based on the evidence that was presented at trial. They could have done that again, but they didn't. Instead, at rebuttal, four times the prosecutor says, we checked it out. We didn't just take everything straight said for truth immediately. We checked it out. And again, this was really prejudicial because of two things. One, the strength of straight's personal motive, and two, the problem was straight's credibility. Without straight's testimony, the state's case would have been very different. And the prosecutor's repeated argument that we checked it out assures the jury that the prosecutor, the state, has already fully vetted the credibility of its star witness. The state did have the opportunity to have the cell towers corroborate where Williams was at the time of the shooting. And that was in evidence, and that was properly used. Is that correct? Williams isn't denying that he was in the car at the time of the shooting. I mean, he testified, he was there, that he was woken up when the shooting happened. He's not denying that. But in this case, the prosecutor's comments, we checked it out, even though they're near the discussion of the cell phone tower evidence. It's not exactly the same. I mean, he's not saying, we checked it out based on the cell tower evidence. He's saying back in January 2010 when he came in, we checked it out. And we checked it out. It's beyond just saying, I believe he's telling the truth. It's, we know he's telling the truth. We checked it out. The state, other prosecutors, we. It's the integrity of the state's attorney's office that they're placing behind its star witness. Tipping the balance between, you know, the balance of the evidence that's between Williams and Straight. Well, we could also be we, state's attorney, we, the gang specialist, we, the phone company, we, the FBI. Arguably, that's the we. Correct. I mean, I guess you're right. It goes beyond just the integrity of the state's attorney's office. It's all the people he's talking about. It's the prosecutor, possibly the gang specialist, possibly the FBI. We just don't know who we is. You frequently reference closely balanced. Your argument on closely balanced would be closer to the point if it were just Straight and the defendant, their version of what happened that evening. But the fact that you have Theotis putting the defendant on the scene and at least at trial putting a gun in his hand, does that take it away from closely balanced? I don't think so, Your Honor. Theotis, his testimony is highly suspect. You have Straight, who's a biased witness, who's got a sweetheart deal from the state, has gunshot residue on his hands. That's given a bazillion, many statements to the police. And you have the suspect witness, Cook Mims, who says he was high. And his first statement, he didn't even know if Carrie Williams had a gun or not. And then at trial, he's now very certain that Williams had a gun. I guess really to the point, the question would be if it was the defendant versus Theotis, then you have the more classic closely balanced, my word against his word. But now you have the defendant against Straight and Theotis. So does that take it out of the realm of closely balanced? I'd say no. Your position is no because Theotis is a gangbanger, convicted felon, who gave an omission the night before and then included him a couple years later at trial? Well, he changed his statement. If he doesn't see whether Williams has a gun or not, if it says he doesn't know whether Williams has a gun or not, and then he changes, that's changed. But, Your Honor, also recently the Illinois Supreme Court in Marcel Simpson found prejudice in a case where there were two flipper witnesses who got sweetheart deals and one independent witness whose testimony was suspicious. This isn't out of the realm, Your Honor. So it's just not one-on-one? It could be one against two? Right. It depends on the credibility of the witnesses and what their situations are and what the testimony is at trial. In cases where the evidence is closely balanced, the probability that even a minor trial error caused the defendant's conviction are greatly enhanced. And these errors were far from minor. This was a pattern of prosecutorial misconduct. The state needed the jury to believe straight. And again, the arguments, the errors in rebuttal argument were all preserved. And so in a case where the errors are preserved, it's the state's burden to prove that these errors were harmless. As I've argued, these errors weren't harmless. They substantially prejudiced Williams and denied him of a fair trial. Due to this pattern of misconduct, we ask that this Court reverse Williams' convictions and remand for a new trial. Thank you. Thank you, counsel. Ms. Gaines. Good morning, Your Honors. May it please the Court. Again, my name is Carol Gaines and I represent the people of the State of Illinois. I'd like to actually start, Your Honors, by responding to Justice Pierce's question about the closely balanced nature of the evidence. And what the case law provides is that the closely balanced nature of the evidence, this Court has to take a common sense approach within a contextual, a context of the evidence, a contextual analysis of what the evidence is within respect to the facts and circumstances beyond the case, within a particular case. That comes to People v. Belknap. The defendant cites People v. Belknap, the appellate court opinion, in his reply brief. However, the Illinois Supreme Court reversed that decision in December of 2014 on the very issue of whether or not the evidence was closely balanced  This case is not just about Angelo Strait v. the defendant. There was corroborating physical evidence that supported Angelo Strait's testimony and contradicted the defendant's testimony. Conveniently, the defendant doesn't talk today, defense attorney doesn't talk today, about the shell casings and the physical evidence that was recovered at the scene. They couldn't lift prints off of them. It doesn't matter, Your Honors, what that evidence showed. The defendant testified, William's whole version of his events was that he's in the car, he's sleeping, he's not the shooter, his hands are over his face, and that Strait reached out, reached across him, and fired out that window. He also said, didn't William say that he had been drinking and had marijuana and was sleeping at the time of the shooting and was awakened by the shooting? No, he said that he was sleeping, he had been drinking, and I would point out, too, the cell records, the cell records, if you look at them carefully in People's Exhibit 61, the cell phone records show that his phone was being used during the time that he said he was asleep. What's important corroborating evidence? What we have here is a shooting. Correct. Where the defendant says, I was there, but I didn't shoot. So what corroborating evidence is there that he did shoot? So look at the shell casings that are littering the street. Had Strait, and there was expert testimony about how guns are fired and how the casings eject and whatnot. Had Strait been firing that gun right in front of William's face, those cartridges would not have ejected and strewn and littered the street as they did. How do we know that? They were found in the back seat. They were found on the front. Because when you look at what Strait testified to, Strait testifies that he stops. Minifield and defendant shoot. He starts to take off. Minifield says, stop, stop, stop, wait, wait, wait, and they shoot some more. Physical evidence shows that there were probably 10 to 12 casings, I think 9 or 10 casings found right in front of where they stopped to shoot, two houses down. There's another 9 to 10 casings that are found on the street. If Strait, and the defense attorney argued in closing, he wasn't so sure about that. He argues in closing that, well, you know, if Strait had been doing the shooting, you know, the state didn't prove that. They didn't, you know, get out of the car so the defendant could, you know, shake off the casings that were in his lap, you know. Well, the state didn't have to prove that because the casings found on the street support what Angelo Strait said occurred that evening. Well, go ahead. I think they issued it. In any event, go ahead. With respect to the prosecutor's comments in rebuttal argument in this case, it is the people's position that the prosecutor absolutely did not vouch for the  It is the defendant's burden. The defendant faces a burden to show the reversal is warranted based on an improper comment by the prosecutor during closing argument. What did he mean when he said we checked it out, we went to the FBI, we asked them what happened, tell us what happened. Okay. What does that mean? What it means, first of all, you have to look at the prosecutor's comments in the entirety of all the proceedings. Look at what the defense attorney argued in opening and closing all over the place. Angelo Strait is a liar. The state knows he's a liar. He lied to the state's face and the state put him on anyway. So what the response to that was, and we can comment on Angelo Strait's credibility, we can comment on the credibility of the witness, is the physical evidence, we checked it out. We don't just take what someone comes in under those circumstances and just willy-nilly put them on the witness stand. We checked it out. We corroborated that evidence. Here's the corroborating physical evidence. We checked it out. It supports Strait's credibility. And that was a comment directed towards Strait's credibility, a proper comment for the prosecutor to make during closing argument. In response to what the defense argued repeatedly, and I would argue, in fact, it was a comment on what the evidence was and how the evidence supported and corroborated Angelo Strait's testimony. The jury knew that he got a deal. They knew that. But when you look at the two testimonies next to each other, I mean the defendant's credibility was seriously questioned as well by what the physical evidence was at trial. No, Strait didn't tell the police about his mother's involvement in buying guns. That's correct. But still, according to what I've read, I'm confused about the record, but evidently the jury somehow knew that this had occurred, that he had lied to the state. I believe it came out during Strait's testimony when he was, and I believe that we funded that during his direct examination, that we did say, and he did, and he admitted, you know, he had a reason why he admitted, you know, he didn't want to get his mother in trouble, obviously, and that didn't necessarily go to the credibility of what he testified to occurred on the night of the offense and in the four months prior. It doesn't necessarily go to that, I would argue. I think that, you know, again, the jury was aware of that. The jury assessed his credibility. The prosecutor's comments in closing were not improper, and they were just a way of explaining what the evidence was which corroborated Angela Strait's testimony. As Your Honor asked about People v. Schaefer, People v. Schaefer, the reason why that conviction was reversed was because the prosecutor, the appellate court had a problem with the prosecutor saying, I think that witness told the truth. And that portion of the prosecutor's closing argument, the appellate court where they talked about the evidence sustaining what that particular witness had said, the court found that that was not problematic. In People v. Pope, and I would point out, this is not a case where the prosecutor's going, I think Strait is telling the truth. I think Strait is, in my humble opinion, in my faith. The prosecutor's not saying that. The prosecutor's not saying that. Pope says if the jury ---- You're not suggesting, are you, that there are magic words that if said is reversible error? It's the concept. Is it unreasonable to conclude that if a prosecutor says, when he came to us, we checked it out, we went to a gang specialist, we went to the FBI and said, help us, tell us what happened here. And we did. Isn't it fair to conclude that, and when we did, we believed him, and therefore we put it on in front of you, so trust us, we checked it out? Isn't that basically what he was saying? No, respectfully, I disagree that that would be, that you can take it that far. People v. Pope says that unless there is an explicit, if the jury has to infer from the prosecutor's comments that he's personally vouching for that witness's credibility, that's not a problem. That's not erroneous. The prosecutor has to explicitly say, you know, we believe, I think, you can believe him, any of those magic, any of those what you would call magic words. It's not enough in this case. As long as the prosecutor stays away from saying, I believe, it's okay. Yes, I think you have to, again, I would look at Pope. If you have to infer from what the prosecutor is saying that he's personally vouching for that witness's credibility, then that's not a problem under People v. Pope. Back in the 1970s and early 80s, prosecutorial argument got so far out of hand that the appellate court in the first district started threatening that if this continues, we're going to start naming names of prosecutors in our opinions. Thus far we have just said the prosecutor. And they did. They started naming names. They didn't seem to have slowed down or stopped. Would you think it seems to be picking up again because prosecutors read these opinions and see Judge Steigman saying that as long as you don't say, I believe, it's okay, I guarantee you prosecutors will refrain from saying, I believe. I don't think in the context of this case, and I agree with you, there was a bad period of time where prosecutors were saying and doing outrageous things that that was a problem in the appellate court. This is not one of those situations. This is not a case when, and again, I think it's a comment on the strength of the evidence supporting the corroborative evidence that supports the credibility of this witness. He's not saying, you know, we checked it out means we went, we found evidence, there is evidence, here's the evidence, you heard the evidence, the evidence corroborates what this witness said. I don't believe that it's that situation in this particular case. With respect to the comments, the prosecutor's comments about the defendant being a marked man, there was, you know, he doesn't say, there's nothing specific in those comments about any threat from either the defendant or Minifield, but there was testimony from a gang specialist that there is a no snitch campaign, there is a code of silence amongst all gang members, that gang members don't cooperate with police for the fear of retribution from their own gang or other gangs. It is that evidence that was sufficiently formed the basis for the prosecutor's very brief comment about the company. Why would that be relevant? If there's no testimony that I'm the eyewitness and I have been threatened by the defendant or his family or his gang, why would that be relevant to have a gang specialist testify that a gang member who testifies is within this culture of retribution? Why would that be relevant if it's not an issue in the case? Well, I think in the context of this case, certainly this case was dictated by gang overtones with respect to why the murders occurred. There was a background history of the gangster disciples versus the Black Peas Stones. It was a gang-motivated or a gang-retaliatory shooting. How did that connect to the defendant, Williams? Again, I would say the comment would go back. And the comment wasn't directed specifically at Williams. The comment was once again directed at Strait's credibility. That was a big issue. That was the defense, you know. But Strait wasn't on trial. Williams was. But the comment was. Why would they need a motive for Strait who was not the shooter, according to the state's theory? The motive was for the defendant. He's the one charged with the murder. But the comment about the marked man wasn't going to. It was going to his credibility as a witness, not. But we were on the topic of the motive for the shooting. The motive for the shooting, according to the opening statement, was the death of the other two gang members. Correct. That was never connected to this defendant. Well, I think, quite honestly, when you look at that, the prosecutor's using the term friends in opening statement synonymous with the defendant's fellow gang members. I mean, there was, first of all, too, with respect to that comment, there was no objection to that comment. It wasn't properly preserved. It is forfeited in front of this court. And, again, under a plain error analysis, the defendant hasn't sustained his burden of showing that it should be considered under a plan of showing that plain error occurred such that you could consider that issue. But with respect to that comment, that he was friends with them, you know, look at what the evidence, again, he used the words friends. It is the people's position that could have just as easily been synonymous with the term of a fellow gang member. Look at the relationship. The defendant was a gang member for 15 years. He's 28 since he's 13. One of the witnesses who was, or one of the victims who was killed, Tommy Williams, was in the same gang faction as this defendant was. He was murdered in the same area where the defendant says his gang, you know, rules and works out of. It was clear while they were driving in the car they were discussing shooting a gangster disciple for retaliation or they were discussing shooting a gangster disciple. They were in that territory. They couldn't find anyone. They went to another location where another gangster disciple accused of killing Sergio Dukes was found. On the street they couldn't really identify them on the street when they started firing at them and they called them the folks. It was just a supposition that maybe those were gangster disciples. And I would argue, as I did in my brief, that that didn't necessarily matter. They're looking for GDs to shoot. They don't find anyone. They don't find anyone in the particular location they go to.  They see people standing on the side of the street and they just, they cut them down. They think, and as it turned out, Theodios Cook-Mims was a gangster disciple in a prior time when he lived in the area. So there wasn't anything so inherently wrong with what the prosecutor argued in opening what he referred to when he referred to them as being his friends. In order to find a reversal, especially where the issue's been forfeited, to find that there was any kind of reversible error there, you'd have to find deliberate misconduct on the part of the prosecutor in the opening statement. And that just did not occur in this case. Counsel, can I go back to the comment about being a marked person? Sure. I think after the first time there was a reference by the prosecutor, it drew an objection. The court, I don't know if the court ruled on it, but admonished the state to confine the argument to the evidence. And then the state two times afterward says, he's going in to serve seven years as a snitch. Repeats the word as a snitch. Who else is in the penitentiary, ladies and gentlemen? And he says, you can't go back to his way of life after this. And in the meantime, the court says again, counsel, you know, keep your arguments of the case and this evidence. Then the third time he goes back and says, that whole life is over. He can't go back to where he lived. For the rest of his life, he'll be labeled. Don't you think that is the very definition of a contemptuous disregard of what the court is trying to tell him? And if there's no curative instruction, how do we know that this didn't impact the jury's deliberation? Well, I think what you have to look at, you have to make the determination. If you find, again, I would argue that that was based on the evidence. And if you find he took it one step too far, you have to make the determination that that one extra sentence or that one extra statement that the prosecutor made constituted a material factor in this defendant's conviction such that the defendant was substantially prejudiced and the jury was so influenced by what he said as to affect the verdict. And you can look at the evidence in this case, which the people assert was corroborated by independent physical evidence of the shell casings and the phone records, which established that these comments by the prosecutor were not a material factor in this defendant's determination of this defendant's guilt as to substantially prejudice him in what was said. This was a closely, the jury asked to have a question answer on accountability. What was the, it doesn't say that it was cured by the instruction for accountability that would have been put in. I don't know that that was applied here. I don't think, I think, as I argued in my brief and I'll argue again today, it's virtually impossible to figure out from a jury's question whether or not, what their perspective is of the nature of the evidence. It's virtually impossible. The question, you know, I have a different suggestion as to what it is. The defense has a different suggestion as to what it might be. You all probably have a different suggestion to what it might mean. And that in and of itself suggests that you cannot determine based on a jury's question. There is some indication from the record that the aggravated battery with a firearm instruction had the accountability language. The first degree murder instruction did not. So maybe they were confused as to why that was. I don't know. But that doesn't necessarily speak to the closely balanced nature of the evidence in this case. It's the people's position that the prosecutor's comments were invited. They were proper comments on the evidence. The evidence in this case established the defendant's guilt beyond reasonable doubt. And the prosecutor's comments did not affect the jury's verdict. We would ask this Court to affirm the defendant's convictions. Thank you, Ms. Gaines. Ms. Philby. Four quick points, Your Honor, about all your honors. First of all, the State talks about invited response. I just wanted to point out that the State's not allowed to vouch for the credibility of its witnesses. And the State has not cited any cases that say that the State can vouch for its witnesses based on invited response. Secondly, when you go back to work on this case, please reread the closing and the opening arguments very, very carefully. About the prosecutor's comments, we checked it out. When you look at it, you can see that the prosecutor goes on for a very long paragraph. We checked it out back in January 2010. We checked it out. We talked to the gang specialist and the FBI. We checked it out. There's two defense objections to that point. During that long first paragraph where the prosecutor says we checked it out twice, there is no discussion whatsoever about phone records or the evidence presented at trial. That's wholly separate. That's wholly about January 2010. We checked it out. So please pay attention to also the locations of their comments. Third, Pope doesn't say that there's special words that make vouching improper, just that the comments have to be explicit. They don't say the prosecutor has to say I believe witness is honest or I think a witness is honest to be improper. It just has to be explicit. In this case, we checked it out. It goes beyond just I believe he's telling the truth. It's saying that we've already vetted him. We know he's telling the truth. We've checked it out. It's a done assessment already from their perspective. Also in Pope, when the court is explaining that it has to be explicit, they say, for example, this is my personal view. That's not limiting it to that phrase being the only way you can have improper vouching. It's saying, for example, there aren't any cases, published cases or unpublished cases that I've found where a prosecutor goes so far to say, we checked it out before we even put this witness on the stand. We checked it out. And finally, about the jury questions, there might not be a way to determine the jury's thoughts for sure. The jury deliberations are obviously in a black box. But we do know that the jury was struggling with the question of whether Williams actually fired the gun or not based on their question of whether they could find him guilty of aggravated battery if he didn't fire the gun. We know they were struggling with this question, and they were really, really considering it. They weren't just sold on straight testimony that he did fire the gun. But there was a general accountability instruction for the murder, basically. For the murder, yes, Your Honor. So the accountability instruction for the general accountability instruction didn't single out any of the charges. It was applicable to the case as a whole. I believe that's correct, Your Honor. But honestly, I'm not 100% sure. If there aren't any additional questions, we ask that this Court reverse Williams' convictions and remand for a new trial. Thank you. Thank you. Counsel, thank you for your excellent presentations. Very much appreciated. This case will be taken under advisement. Court is adjourned.